UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DARRIN LAPINE,

        Plaintiff,

vs.

PATRICIA CARUSO, *et al.*,

        Defendants.

                                      /

Case No. 1:10-cv-1272

Hon. Robert J. Jonker

**REPORT AND RECOMMENDATION**

This is a civil rights action brought by a state prisoner pursuant to 42 U.S.C. § 1983. This matter is now before the court on the following motions: defendants Rozen, Hosey, Misner and Schooley's motion for summary judgment (docket no. 13); plaintiff's motion for default judgment against defendant Moulter (docket no. 23); and defendant Moulter's motion for summary judgment (docket no. 24).

      **I.**      **Background**

Plaintiff filed a119-page complaint naming 11 defendants. Compl. (docket no. 1). The court previously summarized plaintiff's allegations as follows:

> Plaintiff currently is incarcerated in the Chippewa County Jail, but the events giving rise to his complaint occurred while he was incarcerated in the Ionia Correctional Facility (ICF) and the Bellamy Creek Correctional Facility (IBC). In his pro se complaint, he sues the Michigan Department of Corrections (MDOC), MDOC Director Patricia Caruso; Assistant Resident Unit Supervisor Bradley Rosen; Resident Unit Manager Eldor Hosey; Assistant Deputy Warden Scott Schooley; Deputy Warden Kathy Stoddard; Warden Kenneth McKee; Corrections Officers Vern Misner and (unknown) Moulter; Dr. Scott Holmes; and Correctional Medical Services, Inc. (CMS).
>
> Plaintiff claims that while he was incarcerated at ICF, he was elected to be a Warden's Forum representative. According to Plaintiff, ICF staff hated him for

advocating for other prisoners and filing grievances on many issues. On August 24, 2009 [2008], Defendant Moulter allegedly wrote a false misconduct against Plaintiff for fighting and assault that allegedly occurred during a hockey game the previous night. Plaintiff claims that Moulter brought the misconduct charges in retaliation for Plaintiff's grievances and complaints. Moulter allegedly told Plaintiff, "[Y]ou shouldn't have filed all those grievances and pushed that warden forum shit like you did, you wouldn't be going to the hole in 2 block right now. You see how things work around I-Max. Hope you can explain to your family how you lost your parole playing hockey. Now your [sic] in the penalty box. Ha ha ha." (Compl., Page ID#8.) Plaintiff was found guilty of the misconduct charges, but he appears to claim that the conviction subsequently was overturned by the state circuit court.

Plaintiff was transferred to IBC on September 19, 2008. Plaintiff claims that IBC was a security level IV facility, which was three levels higher than his true security level. Immediately after his arrival, Plaintiff began to have severe allergic reactions due to excessive dust in and around his cell. Plaintiff claims that the dust in his cell made him unable to breath and caused him to choke and cough up phlegm. Plaintiff contends that he was unable to access the ventilation system and other crevices where dust, cobwebs and other filth had collected. On February 11, 2009, Defendant Hosey told Plaintiff that he would order a cleaning if Plaintiff got a special medical accommodation, but Plaintiff's request for a special medical accommodation was denied. Plaintiff alleges that despite numerous requests and grievances, cleaning was refused by custody staff and medical refused to clean or to compel custody staff to clean Plaintiff's cell. While maintenance staff ultimately cleaned the ventilation system on March 10, 2009, Plaintiff claims that it did not provide him with any relief. Plaintiff sent letters to numerous individuals about the problem, including Defendants McKee, Stoddard, Schooley, Hosey and Rosen, but they failed to take corrective action.

Plaintiff alleges that he received several threats from IBC staff members regarding his filing of grievances. He specifically claims that Defendants Hosey and Schooley told him on February 4, 2009, that he would be sorry if he did not stop filing grievances. Plaintiff immediately wrote a grievance against Hosey and Schooley. The following day, Defendant Hosey called Plaintiff out to review the grievance. When Plaintiff refused to discuss the grievance with him, Hosey stated, "W[e] are sick of your litigation shit, up front told me to write you up." (Compl., Page ID#12.) Plaintiff contends that Hosey wrote a false misconduct report against him for insolence in retaliation for filing the grievance. Defendant Misner escorted Plaintiff to the misconduct hearing on February 12, 2009. Plaintiff alleges that when he told Misner that the misconduct charge was false and retaliatory, Misner became angry and handcuffed Plaintiff's hands so hard behind his back that it caused Plaintiff severe pain. Even after Plaintiff was found not guilty of the insolence charge, Misner refused to loosen the handcuffs. Plaintiff claims that he suffered cuts, bleeding, swelling, bruising, abrasions and welts on his hands and wrists and has

>permanently lost the full use of his thumb as a result of Misner's excessive use of force.
>
>In Count I of his complaint, Plaintiff claims that Defendants Rosen, Hosey, Schooley, Stoddard and McKee violated his Eighth Amendment rights when they failed to clean the dust and dirt from his cell that caused him to have severe allergeric reactions. In Count II, he contends that Defendant CMS and Holmes failed to provide him adequate medical treatment for his allergies by failing to issue a special accommodation to have his cell cleaned. Count III contends that Defendants Hosey, Rosen and Schooley conspired to retaliate against Plaintiff for filing grievances and complaints by falsifying a misconduct charge for insolence. In Count IV, Plaintiff asserts that Defendant Misner used excessive force in applying the handcuffs behind his back in violation of his Eighth Amendment rights. Plaintiff further claims that Misner's conduct was retaliation for Plaintiff's assertion that the misconduct charge was false and retaliatory. In Count V, Plaintiff claims that Defendant Caruso enacted an unconstitutional policy directive requiring a prisoner to be handcuffed behind his back at a major misconduct charge for a non-violent offense. Plaintiff contends that but for the policy, his wrists would not have been injured by Defendant Misner. Finally, in Count VI, Plaintiff claims that Defendant Moulter wrote a false misconduct against him in retaliation for his grievances and complaints.

Opinion at pp. 2-4 (docket no. 6). Upon initial review, the court dismissed all claims except for Counts III, IV and VI, and dismissed all defendants except for Assistant Unit Resident Supervisor (ARUS) Rosen [Rozen], Resident Unit Manager (RUM) Hosey, Assistant Deputy Warden (ADW) Schooley, Corrections Officer (CO) Misner and CO Moulter. *Id.* at p. 12.

## II. Motion for default judgment (docket no. 23)

Plaintiff has moved for a default judgment against defendant CO Moulter on the ground that Moulter did not respond to the complaint within 21 days after the appearance of his counsel. Plaintiff's motion is without merit. The United States Marshals Service mailed a waiver of service to CO Moulter on July 26, 2011, which he executed on August 5, 2011. *See* Waiver (docket no. 18). Pursuant to Fed. R. Civ. P. 4(d)(3), his answer or other response was due within 60 days after the mailing date, which the Clerk's Office calculated on the docket sheet as September 26, 2011. *Id.* CO Moulter filed his motion for summary judgment on September 23, 2011. Because

3

CO Moulter filed a timely response, there was no basis for entry of a default pursuant to Fed. R. Civ. P. 55(a). Moreover, plaintiff's motion seeking default judgment is procedurally improper. Entry of a default under Fed. R. Civ. P. 55(a) is a prerequisite to entry of a default judgment under Fed. R. Civ. P. 55(b). *Ramada Franchise Systems, Inc. v. Baroda Enterprises, LLC*, 220 F.R.D. 303, 305 (N.D. Ohio 2004). In this case, there has been no default entered against CO Moulter pursuant to Fed. R. Civ. P. 55(a). For these reasons, plaintiff's motion for default judgment should be denied.

### III. Defendants' motions for summary judgment (docket nos. 13 and 24)

#### A. Legal Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56 further provides that "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion by":

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

In *Copeland v. Machulis*, 57 F.3d 476 (6th Cir. 1995), the court set forth the parties' burden of proof in deciding a motion for summary judgment:

> The moving party bears the initial burden of establishing an absence of evidence to support the nonmoving party's case. Once the moving party has met its burden of production, the nonmoving party cannot rest on its pleadings, but must present

>   significant probative evidence in support of the complaint to defeat the motion for summary judgment. The mere existence of a scintilla of evidence to support plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.

*Copeland*, 57 F.3d at 478-79 (citations omitted). "In deciding a motion for summary judgment, the court views the factual evidence and draws all reasonable inferences in favor of the nonmoving party." *McLean v. 988011 Ontario Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). However, the court is not bound to blindly adopt a non-moving party's version of the facts. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

### B.     Failure to exhaust

ARUS Rozen, RUM Hosey, ADW Schooley and CO Moulter seek summary judgment on the ground that plaintiff failed to exhaust his administrative remedies.[1]

#### 1.     Exhaustion requirement

The Prison Litigation Reform Act ("PLRA") 42 U.S.C. § 1997e, provides that a prisoner bringing an action with respect to prison conditions under 42 U.S.C. § 1983 must first exhaust available administrative remedies. *See Porter v. Nussle*, 534 U.S. 516 (2002); *Booth v. Churner*, 532 U.S. 731 (2001). A prisoner must exhaust available administrative remedies, even if the prisoner may not be able to obtain the specific type of relief he seeks in the state administrative process. *See Porter*, 534 U.S. at 520; *Booth*, 532 U.S. at 741. In order to properly exhaust administrative remedies, prisoners must complete the administrative review process in accordance

---

[1] CO Misner concedes that plaintiff exhausted the excessive force claim alleged against him.

with the deadlines and other applicable procedural rules. *Jones v. Bock*, 549 U.S. 199, 218 (2007); *Woodford v. Ngo*, 548 U.S. 81, 90-91 (2006). "Compliance with prison grievance procedures, therefore, is all that is required by the PLRA to 'properly exhaust.' " *Jones*, 549 U.S. at 218.

### 2. Michigan Department of Corrections' grievance process

The Michigan Department of Corrections (MDOC) requires prisoners to follow a three-step process to exhaust grievances. *See* Policy Directive 03.02.130 (effective July 9, 2007). A prisoner must first attempt to resolve a problem with the staff member within two business days of becoming aware of the giveable issue, unless prevented by circumstances beyond his or her control. *Id.* at ¶ P. If the issue is not resolved, then the grievant may file a Step I grievance on the prescribed form within five business days after the grievant attempted to resolve the issue with appropriate staff. *Id.* at ¶¶ P and R. The Policy Directive provides the following directions for completing grievance forms:

> The issues shall be stated briefly but concisely. Information provided is to be limited to the facts involving the issue being grieved (i.e., who, what, when, where, why, how). Dates, times, places and names of all those involved in the issue being grieved are to be included.

*Id.* at ¶ R (emphasis in original). The prisoner must send the Step I grievance to the appropriate grievance coordinator. *Id.* at ¶ V. If the prisoner is dissatisfied with the Step I response, or does not receive a timely response, he must request the appropriate form and send it to the Step II Grievance Coordinator. *Id.* at ¶ BB. Finally, if a prisoner is dissatisfied with the Step II response, or does not receive a timely response, he must send a completed Step III grievance, using the appropriate form, to the Grievance and Appeals Section. *Id.* at ¶ FF.

### 3. Discussion

ARUS Rozen, RUM Hosey and ADW Schooley contend that plaintiff failed to exhaust a grievance against them. In support of their motion, defendants rely on matters set forth in a grievance attached to plaintiff's complaint, Grievance No. IBC-09-02-307-28i ("307") (docket no. 1-4 at pp. 1-5). Similarly, in his motion, CO Moulter contends that plaintiff failed to exhaust a grievance against him, noting that the attachments to plaintiff's complaint did not include a grievance filed against him. Under these circumstances, defendants' motions should be denied. Defendants Rozen, Hosey and Schooley have not produced evidence that Grievance No. 307 was the only grievance filed in this matter. Similarly, defendant Moulter has produced no evidence regarding exhaustion. By relying on grievances attached to (or omitted from) plaintiff's complaint, defendants have improperly shifted the burden of proof for exhaustion to plaintiff. *See Jones*, 549 U.S. at 216 ("[w]e conclude that failure to exhaust is an affirmative defense under the PLRA, and that inmates are not required to specially plead or demonstrate exhaustion in their complaints"). Accordingly, defendants' motions for summary judgment should be denied on this ground.

### C. Retaliation claim against defendants Rozen, Hosey and Schoolcraft (Count III)

In Count III plaintiff contends that ARUS Rozen, RUM Hosey and ADW Schooley conspired to falsify a misconduct charge for insolence in retaliation for plaintiff's filing of grievances and complaints. Plaintiff seeks relief pursuant to 42 U.S.C. § 1983, which confers a private federal right of action against any person who, acting under color of state law, deprives an individual of any right, privilege or immunity secured by the Constitution or federal laws. *Burnett v. Grattan*, 468 U.S. 42, 45 n. 2 (1984); *Stack v. Killian*, 96 F.3d 159, 161 (6th Cir.1996). To state a § 1983 claim, a plaintiff must allege two elements: (1) a deprivation of rights secured by the

Constitution and laws of the United States, and (2) that the defendant deprived him of this federal right under color of law. *Jones v. Duncan*, 840 F.2d 359, 360-61 (6th Cir. 1988); 42 U.S.C. § 1983.

To prove a First Amendment retaliation claim, plaintiff must establish three elements: "1) the plaintiff engaged in activities protected by the Constitution or statute; 2) the defendant took an adverse action that would deter a person of ordinary firmness from continuing to engage in that conduct; and 3) that this adverse action was taken at least in part because of the exercise of the protected conduct." *Smith v. Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2001). *See also Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc). To establish the causation element of a retaliation claim, "the plaintiff must be able to prove that the exercise of the protected right was a substantial or motivating factor in the defendant's alleged retaliatory conduct." *Smith*, 250 F. 3d at 1037, *citing Mount Health City School District Board of Education v. Doyle*, 429 U.S. 274, 287 (1977). "[B]ecause prisoner retaliation claims are easily fabricated, and accordingly pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration, we are careful to require non-conclusory allegations." *Bennett v. Goord*, 343 F.3d 133, 137 (2nd Cir. 2003) (internal quotation marks omitted).

In his complaint, plaintiff alleged that RUM Hosey took adverse action against him by issuing a "false" misconduct on February 5, 2009. Compl. at pp. 12, 17. Plaintiff alleged that RUM Hosey took this action in concert with Rozen and Schooley because plaintiff had filed a grievance against Hosey and Schooley on February 4, 2009. *Id.* Plaintiff also alleged that he filed "other grievances" and that when plaintiff spoke to RUM Hosey about the grievance filed on February 4th, Hosey stated "we are sick of your litigation s**t, up front told me to write you up." *Id.* at p. 12.

8

Defendants contend that plaintiff has failed to demonstrate the causation element of his retaliation claim. The record reflects the following facts. On February 5, 2009, RUM Hosey issued the misconduct report which stated in pertinent part:

> On 02-05-09 at 13:05 prisoner Lapine was called to my office. I asked prisoner Lapine did he hand the attached memo to Arus Rozen. Prisoner Lapine stated he did hand the attached memo to Arus Rozen. Arus Rozen and myself did review the attached memo and it did make us feel manipulated, harassed and alarmed as prisoner Lapine did this to try and be locked up with another prisoner that he could choose and if we didn't give him this there would be consequences.

Misconduct Report (Feb. 5, 2009) (docket no. 1-4 at p. 6).

The document or memo presented to ARUS Rozen was entitled "Officials of prison must review inmates compatibility before bunking[;] Liability for prison officials for injuries to prisoners caused by assault by other prisoners 41 ALR 3rd 1021 emphasis added." *See* Document (docket no. 1-4 at p. 7). This document includes various legal statements and conclusions regarding the "Illegality of random bunking of inmates (Federal Law)." *Id.* The final paragraph of the document stated as follows:

> Wherefore this is a request/warning that I alert you, the liable official, to the condition brought forth as I direct your attention to, failure to act upon my alert Violates all case authority and constitutional provisions cited. Acting under color of state law does not render you exempt or immune from criminal or civil liability.

*Id.* At the bottom of the document, plaintiff "certified" that he "served" ARUS Rozen with the document on January 29, 2009. *Id.*

At a misconduct hearing held on February 12, 2009, the hearing officer found plaintiff not guilty of the misconduct charge of insolence. Major Misconduct Hearing Report (Feb. 5, 2009) (docket no. 1-4 at p. 8). In support of this finding, the hearing officer found that the memo

9

sent to ARUS Rozen and RUM Hosey consisted of "information" that the prisoner wanted them to consider and which was not intended "harass, degrade or alarm" Rozen and Hosey. *Id.*

Plaintiff's alleged causation appears to be based on the temporal proximity of the grievance (filed on February 4th), his alleged meeting with RUM Hosey (February 5th) and Hosey subsequent issuance of the false misconduct report (February 5th). The Sixth Circuit has noted that temporal proximity alone may be significant enough to constitute indirect evidence of a causal connection so as to create an inference of retaliatory motive. *See Mohammad v. Close*, 379 F.3d 413, 417-18 (6th Cir. 2004). However, the record does not support plaintiff's claim. While plaintiff dated the grievance on February 4, 2009, the face of the grievance indicates that it was not received by the MDOC until February 9, 2009. *See* Grievance 307. Plaintiff has presented no evidence that RUM Hosey was aware of this unfiled grievance when he issued the misconduct report on February 5th. Based on this record, the unfiled grievance could not have been the "protected conduct" which motivated the alleged retaliation.

In addition,, defendants Rozen, Hosey and Schoolcraft have filed uncontested affidavits denying that the misconduct report was written in retaliation for plaintiff's prior grievances and litigation activity. In his affidavit, ARUS Rozen stated that on February 5, 2009, RUM Hosey wrote plaintiff an insolence misconduct due to a document plaintiff sent to Rozen regarding cell assignments. Rozen Aff. at ¶ 4 (docket no. 14-2). Rozen felt that the document was an attempt to manipulate a cell move so that plaintiff could lock up with a prisoner of his choice. *Id.* Rozen stated that the misconduct was not related to grievances filed by plaintiff, being motivated solely by Rozen's belief that plaintiff was attempting to manipulate a cell move. In his affidavit, RUM Hosey stated that he met with plaintiff regarding plaintiff's written request to be moved with

10

another prisoner that he chose. Hosey Aff. at ¶ 4 (docket no. 14-1). Plaintiff's request "was inappropriate with his demands for cell placement by his language and his intent on the written request." *Id.* Hosey wrote a misconduct report "for plaintiff's insolence directed at staff." *Id.* Hosey stated that he would have written the misconduct report regardless of whether plaintiff filed grievances against him or any other staff. *Id.* at ¶ 5. In his affidavit, ADW Schooley denied that he conspired with ARUS Rozen or RUM Hosey to falsify a misconduct ticket. Schooley Aff. at ¶ 3 (docket no. 14-3). Plaintiff has not submitted a counter-affidavit or other evidence to contest the statements in these affidavits, and, accordingly, defendants Rozen, Hosey and Schooley are entitled to summary judgment on plaintiff's retaliation claim.

### D.     Claims against defendant Misner (Count IV)

Plaintiff alleged that CO Misner used excessive force against him while escorting plaintiff to the misconduct hearing on February 12, 2009. According to plaintiff, Misner struck him on the back of the head and refused to loosen the handcuffs when plaintiff told Misner that the misconduct charge was false and retaliatory. Compl. at pp. 10-14, 18. Plaintiff alleged that CO Misner deliberately tightened the handcuffs to cause injuries, that plaintiff immediately complained that the cuffs were too tight and that he was "crying out in pain." *Id.* at p 18.

#### 1.     Excessive Force

The Supreme Court has held that "the unnecessary and wanton infliction of pain . . . constitutes cruel and unusual punishment forbidden by the Eighth Amendment." *Hudson v. McMillian*, 503 U.S. 1, 5 (1992) (quoting *Whitley v. Albers*, 475 U.S. 312, 319 (1986)). In analyzing plaintiff's claims, the court must examine whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm. *Hudson*, 503 U.S. at

6. Courts evaluate the injury suffered, "the need for application of force, the relationship between that need and the amount of force used, the threat 'reasonably perceived by the responsible officials,' and 'any efforts made to temper the severity of a forceful response.'" *Id*. at 7, quoting *Whitley*, 475 U.S. at 321.

Courts must give deference to actions prison guards take to maintain prison discipline, as long as those actions are taken pursuant to a considered choice and not in bad faith or for no legitimate purpose. *Whitley*, 475 U.S. at 321-22. "[Not every] malevolent touch by a prison guard gives rise to a federal cause of action." *Hudson*, 503 U.S. at 9. Where the use of some force is required to restore order, it does not violate the Eighth Amendment unless the force used is "repugnant to the conscience of mankind" or the force is used "maliciously and sadistically for the very purpose of causing harm." *Id.* at 9,10 (citations omitted). While an Eighth Amendment claim need not to include a "significant injury" complaint, a *de minimis* use of physical force will not support such a claim unless the force used is "of a sort repugnant to the conscience of mankind." *Hudson*, 503 U.S. at 9-10.

Plaintiff's complaint included a copy of a physical examination from the date of the hearing (February 12, 2009). *See* Medical Records (docket no. 1-5 at pp. 8-9). At the examination, plaintiff reported that his left thumb was numb from handcuffs and that he had scratches from the cuffs. *Id.* at p. 9. Examination revealed that plaintiff had "superficial 1" lacerations bil med wrists, and < 1/4 cm superficial lacerations bil lat wrists" and "Red marks @ bil wrists." *Id.* Plaintiff was given band aids and topical anti-biotic ointment for the affected areas. *Id.* at p. 8; Compl. at p. 14. Plaintiff relies on this medical record to support his excessive force claim.

In support of his motion, CO Misner has filed an affidavit denying the use of excessive force. CO Misner's affidavit sets forth the following facts. When CO Misner met plaintiff to escort him to the hearing room, plaintiff took off his coat, tucked in his shirt and turned around. Misner Aff. at ¶ 3 (docket no. 14-4). CO Misner placed handcuffs on plaintiff's wrist "and slid them up and down to make sure they were properly applied." *Id.* Plaintiff said nothing about the handcuffs at that time. *Id.* Misner walked through the sliding door to go to the hearing with "no hands on prisoner." *Id.* They entered the hearing room and Misner told plaintiff to sit in the red chair to the right. *Id.* Plaintiff sat down and said nothing to Misner during the hearing. *Id.* When the hearing was done, they both got up and exited the room. *Id.* Misner took off the cuffs, plaintiff put on his coat and walked back to his unit. *Id.* According to Misner, "[a]t no time did prisoner LaPine say anything about his cuffs." *Id.* Plaintiff did not file an affidavit to contest CO Misner's account of the events.

Viewing the evidence in the light most favorable to plaintiff, CO Misner actions did not rise to the level of a constitutional violation for excessive use of force. There is no evidence that CO Misner struck plaintiff on the head. Although the Eighth Amendment may be violated by something less than a serious injury, it requires something more than a *de minimus* injury. *Jones Bey v. Johnson*, 248 Fed Appx. 675, 677 (6th Cir.2007) (holding that pain and swelling caused to the plaintiff's wrists by the guards pulling his handcuffs and striking his hands on the food slot were insufficient injuries to demonstrate a violation of the Eighth Amendment). Here, plaintiff's injuries were *de minimis* at worse. Furthermore, while plaintiff suffered minor injuries from the handcuffs, not all allegations of tight handcuffing amount to excessive force. *Lyons v. City of Xenia*, 417 F.3d 565, 575 (6th Cir. 2005). In order to reach a jury on an excessive force claim arising from

handcuffing, a plaintiff must establish (1) that he received a physical injury from the handcuffing, and, (2) that the officers ignored the plaintiff's complaints that the handcuffs were too tight. *Lyons*, 417 F.3d at 575-76.  CO Misner's uncontested affidavit established that plaintiff did not complain that the handcuffs were too tight.  The evidence does not demonstrate that CO Misner used an amount of force that was "repugnant to the conscience of mankind," or that he used force "maliciously and sadistically for the very purpose of causing harm." *Hudson*, 503 U.S. at 9-10.  CO Misner is entitled to summary judgment on this claim.

### 2.     Retaliation

Plaintiff alleged that CO Misner used excessive force against him in retaliation for plaintiff's statement that RUM Hosey had filed a false misconduct.  Compl. at pp. 12-14, 18. Assuming that plaintiff's comment to CO Misner was protected conduct, plaintiff failed to meet the second prong of his retaliation claim because there was no adverse action taken against him. Accordingly, CO Misner is entitled to summary judgment on plaintiff's retaliation claim.

### E.     Retaliation claim against defendant Moulter (Count VI)

Plaintiff alleged that CO Moulter retaliated against him by filing false misconduct tickets after he had a confrontation with Moulter.  Compl. at pp. 7-8, 20.  Plaintiff alleged that the protected conduct was filing grievances and being on the warden's forum. *Id.*  Specifically, plaintiff alleged that he had a confrontation with CO Moulter on August 24, 2008, at which time Moulter told him that

> [Y]ou shouldn't have filed all those grievances and pushed that warden forum s**t like you did, you wouldn't be in the hole in 2 block right now.  You see how things work around I-Max.  Hope you can explain to your family how you lost your parole playing hockey.  Now your [sic] in the penalty box.  Ha, ha, ha.

*Id.*

Then, after reviewing a videotape of an inmate hockey game that occurred on August 23, 2008, CO Moulter wrote plaintiff two misconduct tickets for plaintiff's conduct during the game. Major Misconduct Report (Fighting) (docket no. 1-6 at p. 4; Major Misconduct Report (Assault) (docket no. 1-6 at p. 6). One misconduct ticket involved fighting with prisoner Garza, i.e., "exchanging blows to the head during a hockey game in the gym." Major Misconduct Report (Fighting). The other ticket involved assault resulting in serious physical injury involving prisoner Huizar, i.e., plaintiff was observed striking Huizar "in the head with a hockey stick, causing lacerations to prisoner Huizar's face." Major Misconduct Report (Assault).

On August 25, 2008, Hearings Investigator Saudia Peterson sent a memorandum to Warden Smith, which appears to express reservations about the misconduct tickets:

> I met with prisoner Lapine 305535 today. He gave me a letter written to you, requesting you review the video footage and pull the two tickets. I reviewed the video and found no assault or fight. I don't know who made the copy of this video, but I reviewed the original tape to see if there was anything there and i [sic] found nothing. What do you want me to do with this?

Memorandum (Aug. 25, 2008) (docket no. 1-6 at p. 9).

Despite the reservations expressed by Peterson, the MDOC held hearings on September 2, and 3, 2008, and plaintiff was found guilty of both violations. Major Misconduct Hearing Report (Fighting) (Sept. 2, 2008) (docket no. 1-6 at p. 5); Major Misconduct Hearing Report (Assault) (Sept. 3, 2008) (docket no. 1-6 at p. 7).

Plaintiff alleged that he appealed these convictions to the Ingham County Circuit Court, docket no. 09-79-AA, and that the court overturned the misconduct tickets. Compl. at pp. 8-9, 20. A copy of part of an e-mail from "Long, James (AG)" to plaintiff's sister (Dianne Compo) stated in part that plaintiff prevailed in Case No. 09-79-AA "where he challenged a major

15

misconduct ticket issued to him during his incarceration with the Michigan Department of Corrections (MDOC)." *See* Partial e-mail (docket no. 1-6 at p. 14). However, the partial e-mail refers to only one "major misconduct ticket" and does not link that ticket to the tickets involved in the present case. In a document entitled "Addendum to Oppose Moulter's Summary Judgment" (docket no. 28), plaintiff stated that the Ingham County Circuit Court overturned the misconduct tickets on December 21, 2009. No affidavit was attached. Plaintiff has not provided the court with a copy of this alleged order, which the circuit court issued well over a year after the two misconduct findings, and the court will not speculate as to the missing order.

CO Moulter contends that plaintiff failed to demonstrate the causation element of his retaliation claim with respect to the two misconduct tickets because plaintiff was found guilty on both major misconducts. The court agrees. "A finding of guilt based upon some evidence of a violation of prison rules 'essentially checkmates [a] retaliation claim.'" *Jackson v. Madery*, 158 Fed. Appx. 656, 662 (6th Cir. 2005), quoting *Henderson v. Baird*, 29 F.3d 464, 469 (8th Cir.1994). As in *Jackson*, the misconduct reports list the evidence to support the findings of guilt. *See Jackson*, 158 Fed. Appx. at 662; Major Misconduct Hearing Report (Fighting) (Sept. 2, 2008); Major Misconduct Hearing Report (Assault) (Sept. 3, 2008). Accordingly, CO Moulter is entitled to summary judgment on plaintiff's retaliation claim.

### F.     Qualified Immunity

Finally, defendants Rozen, Hosey, Misner, Schooley and Moulter seek qualified immunity with respect to plaintiff's claims.

> Under the doctrine of qualified immunity, government officials performing discretionary functions are shielded from civil liability unless their conduct violates clearly established constitutional rights. *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Thus, a defendant is entitled to qualified

immunity on summary judgment unless the facts, when viewed in the light most favorable to the plaintiff, would permit a reasonable juror to find that: (1) the defendant violated a constitutional right; and (2) the right was clearly established. *Pearson v. Callahan*, 555 U.S. 223, 129 S.Ct. 808, 816, 172 L.Ed.2d 565 (2009).

*Bishop v. Hackel*, 636 F.3d 757, 765 (6th Cir 2011). The court may exercise its sound discretion "in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236. In this instance, the first prong is lacking, since as previously discussed, defendants did not violate plaintiff's constitutional rights. In the absence of either prong, defendants are entitled to qualified immunity.

### III. Recommendation

For the reasons set forth above, I respectfully recommend that plaintiff's motion for default judgment (docket no. 23) be **DENIED**, that defendants' motions for summary judgment (docket nos. 13 and 24) be **GRANTED**, and that this action be **TERMINATED**.

Dated: February 13, 2012          /s/ Hugh W. Brenneman, Jr.
                                  HUGH W. BRENNEMAN, JR.
                                  United States Magistrate Judge

ANY OBJECTIONS to this Report and Recommendation must be served and filed with the Clerk of the Court within fourteen (14) days after service of the report. All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b). Failure to serve and file written objections within the specified time waives the right to appeal the District Court's order. *Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).